# Memorandum – Part 2

A.    Defendants Have Pled The Specific Time
And Place Of Mr. Perry's Misrepresentations To Satisfy Rule 9(b).

In Plaintiff's motion to dismiss, Plaintiff claims that Defendants' description of the time and place of Mr. Perry's misrepresentations ("during contract negotiations") was not specific enough to conform to the particularity requirement of Rule 9(b). However, courts have warned that Rule 9 must not be interpreted in a vacuum with respect to pleading, and that its heightened requirements should be balanced with Rule 8, such that they must be read together to accomplish the pleading envisioned by the Federal Rules. Sears Petrol. & Transp. Corp. v. Ice Ban Am., Inc., No. 99-Civ-704, 2004 U.S. Dist. LEXIS 6661, at *23 (N.D.N.Y. Apr. 15, 2004); Gelles, 1991 U.S. Dist. LEXIS 3135, at *12. Thus, although Defendants "may not have pinpointed the exact time and place of every representation, they have given sufficient notice of the time period during which these representations were made." Sears Petrol. & Trans. Corp., 2004 U.S. Dist. LEXIS 6661, at *28; see also Lehman Bros. Commercial Corp. v. Minmetals Int'l, No. 94-Civ-8301(JFK), 1995 U.S. Dist. LEXIS 15185, at *8 (S.D.N.Y. Oct. 10, 1995)(finding particularity satisfied because party "need not marshall all its evidence at this time before discovery has taken place."); Gelles, 1991 U.S. Dist. LEXIS 3135, at *16 ("Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map.").

In response to Plaintiff's concerns, Defendants amended their counterclaims to specify that "during contract negotiations" referred to the period of one month before the execution of the Worth CBA (*i.e.*, December 2002) and the Broadway CBA (*i.e.*, December 2004). (Ex. A, Am. CC ¶¶3, 4, 12, 13, 40, 42); see also Gelles, 1991 U.S. Dist. LEXIS 3135, at *15 (finding three month time period for alleged fraudulent scheme satisfied Rule 9's specificity requirement).

---

typically grant upon a Rule 9 dismissal (absent bad faith or futility). Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d Cir. 2001); Kaslof, 2000 U.S. Dist. LEXIS 21053, at *50-51.

In addition, Defendants also added that the contract negotiations took place at the shared office between the Union and the Plan on West 31st Street. (Ex. A, Am. CC ¶¶8, 17, 43). Thus, Defendants' Amended Counterclaims have mooted Plaintiff's pleading concerns in this respect, and Plaintiff's motion should be denied.

      B.    Defendants Have Pled Mr. Perry's Agency
           <u>Relationship To The Plan To Satisfy Federal Pleading Requirements.</u>

In Plaintiff's motion to dismiss, Plaintiff also took issue with Defendants' pleading because Plaintiff claims that Defendants did not specify any facts to support the notion that Mr. Perry acted as an agent of the Plan to bind the Plan to Mr. Perry's misrepresentations concerning the existence and purpose of the Plan and the Plan's compliance with various federal and state regulations. It is well-settled that agency relationships need only be pled in a manner sufficient to satisfy the "short and plain statement" pleading standard under Rule 8 of the Federal Rules, rather than the heightened pleading required by Rule 9. <u>See</u> <u>Compudyne Corp. v. Shane</u>, 453 F. Supp. 2d 807, 825 (S.D.N.Y. 2006)("The existence of an agency relationship need only be pled in compliance with Fed. R. Civ. P. 8."); <u>Fed. Deposit Ins. Corp. v. FSI Futures, Inc.</u>, No. 88-Civ-0906(PNL), 1990 U.S. Dist. LEXIS 2907, at *17 (S.D.N.Y. Mar. 16, 1990)("Unlike fraud, there is no particularity requirement for pleading agency."). Thus, Defendants have satisfied the Rule 8 pleading requirement by providing Plaintiff with more detailed allegations in Defendants' Amended Counterclaims to support the contention that Mr. Perry acted as an agent of the Plan for purposes of obtaining Defendants' agreement to the Broadway CBA and the Worth CBA.

More specifically, Defendants allege that when Mr. Wiener attended contract negotiations for the Broadway CBA and the Worth CBA, he went to the shared office of the Union and the Plan located on West 31st Street, which indicates that Mr. Perry represented both the Union and the Plan. (Ex. A, Am. CC ¶¶8, 17, 43). Moreover, the Amended Counterclaims

NYK 1173820-1.054475 0022

also establish that Mr. Perry, who was the Union's trustee of the Plan, indicated to Mr. Wiener during these periods of time that he represented the Plan as well as the Union; thus, Defendants reasonably understood that the Union and the Plan were actually one organization that was represented by Mr. Perry. (Id. at ¶¶9, 10, 19). Thus, because Mr. Perry held himself out as an agent of the Plan to Mr. Wiener, Mr. Perry bound the Plan to his statements. In addition, by sharing an office, clerical employees and a phone number with the Union, as well as giving Mr. Perry the title of "trustee" of the Plan, the Plan gave Mr. Perry at least the "apparent authority" to bind the Plan to his statements. (Id. at ¶¶8-10, 17, 19, 43). Taken together, these detailed allegations satisfy the agency pleading requirements of Rule 8. Compudyne Corp., 453 F. Supp. 2d at 825; FSI Futures, Inc., 1990 U.S. Dist. LEXIS 2907, at *17.[9] In addition, Mr. Mota was given the same phone number for both the Union and the Plan, and no matter whom he intended to call, Ms. Torres would answer the phone. (Ex. A, Am. CC ¶¶23-25). Thus, Defendants' Amended Counterclaims adequately establish that Defendants and their employees were led to believe that the Union and the Plan were the same entity, and that Mr. Perry was acting in an agency capacity for both when he made misrepresentations to Mr. Wiener concerning the Plan's existence and the Plan's compliance with federal and state regulations.

Perhaps the most compelling evidence of Mr. Perry's agency on behalf of the Plan is that, on at least five occasions since 2005, Mr. Perry asked Mr. Wiener about the possibility of leasing retail store space at Worth Street for *both the Union and the Plan*. (Id. at ¶¶19, 20). Such a request to lease a shared space also reasonably indicated to Mr. Wiener that Mr. Perry was acting in an agency capacity for both the Union and the Plan. Accordingly, these facts are sufficient to

---

[9] The same analysis applies to Mr. Cruz as well.

survive Plaintiff's motion to dismiss Defendants' Amended Counterclaims, and, thus, the motion
should be denied.

III.    **DEFENDANTS' COUNTERCLAIMS ARE NOT PRE-EMPTED BY ERISA**

    A.   <u>Defendants' Counterclaims Are Not Expressly Pre-Empted By ERISA.</u>

Plaintiff claims that even if the Court were to accept Defendants' Amended
Counterclaims, the amendments are futile because the counterclaims are expressly pre-empted by
ERISA. While ERISA requires that state laws that "relate to" a benefit plan be pre-empted,
courts have warned that the expansive phrase "relate to" must not be taken "literally." <u>DaPonte
v. Manfredi Motors Inc.</u>, 335 F. Supp. 2d 352, 358 (E.D.N.Y. 2004)(finding fraud claim not pre-
empted by ERISA), aff'd, 157 Fed. Appx. 328 (2d Cir. 2005). "'State law claims whose effect on
employee benefit plans is merely tenuous, remote or peripheral are not preempted.'" <u>Id.</u> (quoting
<u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 100 (1983)). In this case, it is well-established that
Defendants' common law fraud counterclaims are not expressly pre-empted because the Second
Circuit has held that fraud claims are not pre-empted by ERISA if they "seek[] to advance the
rights and expectations created by ERISA." <u>Geller v. County Line Auto Sales, Inc.</u>, 86 F.3d 18,
23 (2d Cir. 1996)(vacating dismissal of fraud claim because not pre-empted by ERISA). Under
the circumstances of this case, Defendants allege that the Plan was a fraudulent sham that failed
to provide Defendants' employees with the promised health benefits, so Defendants must be
allowed to pursue their Amended Counterclaims to advance the rights of Defendants' employees.

When evaluating whether or not a fraud claim should be pre-empted by ERISA, courts
evaluate the following factors: whether the alleged misrepresentations relate directly to a
participant's benefits under a benefit plan, whether the resolution of the claim would determine
whether benefits are paid out to a participant and whether such a claim would directly interfere
with the administration of benefits under the plan. <u>See, e.g.</u>, <u>DaPonte</u>, 335 F. Supp. 2d at 359;

NYK 1173820-1.054475.0022

Towne v. Nat'l Life of Vt., Inc., 130 F. Supp. 2d 604, 609 (D. Vt. 2000)(finding fraud claim not

pre-empted because ERISA only "pre-empts . . . claims that seek to recover benefits, enforce

rights or clarify rights under an ERISA Plan."); Sandler v. N.Y. News Inc., 721 F. Supp. 506,

514-15 (S.D.N.Y. 1989)(finding negligent misrepresentation claim not pre-empted); McNamee

v. Bethlehem Steel Corp., 692 F. Supp. 1477, 1479 (E.D.N.Y. 1988)(finding fraud claim not pre-

empted).  Defendants' counterclaims do not seek to obtain participant benefits under the Plan, do

not request the payout of benefits to Defendants' employees and do not interfere with the

administration of the Plan because Defendants allege that, in fact, there was no real Plan in

existence.[10]  Accordingly, Defendants' counterclaims are not pre-empted, and Plaintiff's motion

to dismiss should be denied.

In addition, Defendants' fraud claims are not pre-empted because courts have recognized

that, in the context of a fraud claim, statements which were made *prior* to an individual ever

enrolling in the plan at issue could not logically be "related to" a plan because the individual is

not even a part of the plan at that time.  See, e.g., Perry v. P*I*E Nationwide, Inc., 872 F.2d 157

(6th Cir. 1989)(affirming district court's decision not to pre-empt fraud claim because purported

misconduct occurred before plaintiffs became participants of the plan); Johnson v. Antioch

Univ., No. 91-0133-LFO, 1992 U.S. Dist. LEXIS 4931, at *6-7 (D.D.C. Apr. 15, 1992)(finding

---

[10] Plaintiff relies on several distinguishable cases to support its express pre-emption argument, namely, Adams v. AT&T Corp., No. 04-Civ-789, 2007 U.S. Dist. LEXIS 40869 (N.D.N.Y. Jun. 5, 2007), Snyder v. Elliot W. Dann Co., Inc., 854 F. Supp. 264 (S.D.N.Y. 1994), and Sandler v. Marconi Circuit Tech. Corp., 814 F. Supp. 263 (E.D.N.Y. 1993).  These cases are inapposite because the claimants in these cases focused on oral statements or other modifications to written benefit plans that already existed and sought the payout of their plan benefits; thus, the courts pre-empted the fraud claims because the contents of the written benefit plan controlled the analysis, making pre-emption appropriate.  In this case, none of the misrepresentations made to Mr. Wiener concern the language of any written benefit plan; in fact, Defendants contend that there was never any real plan to begin with.  In addition, Defendants are not seeking the payout of benefits.  Rather, Defendants seek restitution for the contributions already made to the Plan that never resulted in benefits to Defendants' employees as bargained for under the Broadway CBA and the Worth CBA.  Accordingly, these circumstances justify the denial of Plaintiff's motion to dismiss.

no pre-emption because misrepresentations made "before the plan itself ever took effect"). Further, courts in this Circuit have also recognized that where the misrepresentations about the Plan are made in the context of negotiating an agreement collateral to the benefit plan (rather than the benefit plan itself), such claims are also not pre-empted as a matter of law. See, e.g., DaPonte, 335 F. Supp. 2d at 358 (no pre-emption because misrepresentation about plan related to plaintiff's terms of reemployment); McNamee, 692 F. Supp. at 1479 (no pre-emption because misrepresentation about plan related to collateral employment agreement).

In this case, Defendants allege that Plaintiff's representative – Mr. Perry -- made material misrepresentations concerning the Plan's intent to provide health benefits and the Plan's compliance with state and federal regulations in order to obtain Defendants' consent to enter the Broadway CBA and the Worth CBA. (Ex. A, Am. CC ¶¶4, 13, 40, 42). Thus, because the misrepresentations were made during the negotiation of the collateral Broadway CBA and the Worth CBA, they were collateral to any benefit plans, and, similar to DaPonte and McNamee, the misrepresentations did not "relate to" the plan for purposes of ERISA. With respect to the Worth CBA, neither Defendants nor their employees were participants in the benefit plan at the time the misrepresentations were made in 2002 concerning the Worth CBA. Accordingly, Plaintiff's motion to dismiss Defendants' counterclaims should be denied.

B.    Defendants' Counterclaims Do Not Conflict With ERISA.

In support of its motion to dismiss, Plaintiff argues that Defendants' counterclaims for fraud substantively conflict with ERISA for three reasons: (i) any award of damages for fraud would violate the "anti-inurement" provision of ERISA, 29 U.S.C. § 1103(c)(1), which states that the assets of an employee benefit plan should never inure to the employer, (ii) that Defendants have not demonstrated that either the Broadway CBA or the Worth CBA is void and (iii) as employers, Defendants have no standing to make fraud claims. To the contrary,

Defendants' Amended Counterclaims do not substantively conflict with the goals of ERISA because the Second Circuit has recognized that "'insuring the honest administration of financially sound plans' is critical to the accomplishment of ERISA's mission." Geller, 86 F.3d at 23 (internal citations omitted).

      i.      Defendants Have Standing
              To Make Federal Common Law Fraud Claims Against Plaintiff.

Plaintiff argues that allowing Defendants to pursue their counterclaims would violate ERISA's "anti-inurement" clause, which provides that no assets of an employee benefit plan may inure to the employer. 29 U.S.C. § 1103(c)(1). Contrary to Plaintiff's assertions, courts have permitted employers to pursue federal common law fraud claims against fiduciaries of employee benefit plans to obtain restitution and/or damages to make employers whole when, under similar circumstances, the employer has been defrauded by a benefit plan or its trustees. See, e.g., Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts, 954 F.2d 299, 304-05 (5th Cir. 1992)(recognizing employer's federal common law right of restitution to recoup overpayment to union pension funds); Kwatcher v. Mass. Serv. Employees Pension Fund, 879 F.2d 957, 967 (1st Cir. 1989)(recognizing equitable right of recovery for overpayments to funds and remanding to district court to determine whether employer was eligible for recovery); Plucinski v. I.A.M. Nat'l Pension Fund, 875 F.2d 1052, 1058 (3d Cir. 1989)(recognizing employer's federal common law right to pursue equitable remedy); Carl Colteryahn Dairy, Inc. v. W. Penn. Teamsters & Employers Pension Fund, 847 F.2d 113, 121 (3d Cir. 1988)(recognizing employer's right to pursue federal common law remedy because "we doubt that Congress intended that innocent employers, penalized by the fraudulent exercise . . . would be without remedy."). Indeed, "actions for restitution seek only the return of amounts actually paid to, and unjustly retained by, pension funds. No such award can jeopardize the legitimate claims of other

contributors, since *'participants and beneficiaries are not entitled to funds to which they had no right in the first place.'"* Kwatcher, 879 F.2d at 967 (emphasis added)(internal citations omitted).

This case bears striking similarity to Carl Colteryahn Dairy, Inc. which held that a defrauded employer had a federal common law cause of action "for the return of any sums that were fraudulently assessed by a pension plan." Carl Colteryahn Dairy, Inc., 847 F.2d at 115. In Carl Colteryahn Dairy, Inc., an employer withdrew from making contributions to a union's pension plan, and, in response, the fund demanded the outstanding amount allegedly owed to the fund. Id. at 115. In response to the fund's request for payment, the employer filed a lawsuit against the fund alleging that the fund had "fraudulently induced" the employer to accept a merger between the fund and another benefit plan by making "misrepresentations and concealments" in violation of ERISA. Id. The fund argued that the employer had no standing to make such a claim, and the District Court dismissed the employer's fraud claims. Id. However, the Third Circuit Court of Appeals reversed the District Court and held that the employer was entitled to pursue its fraud claims under a federal common law cause of action for the return of any sums that it believed to be improperly assessed against it. Id.

As the basis of its reasoning, the Third Circuit stated in Carl Colteryahn Dairy, Inc. that federally regulated ERISA plans were "equitable" in character and, as such, "that equitable principles should be applied." Id. at 121. Moreover, the Third Circuit expressed doubt that "Congress had given multiemployer plans the immense power that the Fund has exercised . . . yet did not intend to place some check on the conduct and practices of such plans." Id. Other courts have followed the Third Circuit's reasoning. See, e.g., Jamail, Inc., 954 F.2d at 304 (stating failure to allow employer cause of action would place trustee in a position to be able to extort money from employer by fraud without any remedy for the employer to recoup funds);

Plucinski, 875 F.2d at 1058 (same).  Accordingly, based on equitable principles, Defendants
have a cause of action to pursue their counterclaims under federal common law, and such claims
would not violate ERISA's anti-inurement clause because the Plan was never entitled to the
funds in the first place, *i.e.*, Defendants' employees never received benefits as promised by the
Plan's representations.  Kwatcher, 879 F.2d at 967.

> ii.  Defendants Have Pled Fraud In The
>      Execution, Which Is A Valid Defense To An ERISA Action.

Next, Plaintiff argues that Defendants have pled only "fraudulent inducement," which
renders a contract "voidable" rather than "void," and that, in the ERISA context, an employer is
only entitled to establish defenses to contribution claims that render a contract "void," *e.g.*, fraud
in the execution.  "Fraud in the execution occurs where there is a 'misrepresentation as to the
character or essential terms of a proposed contract,' and a party signs without knowing or having
a 'reasonable opportunity to know of its character or essential terms.'"  Hetchkop v. Woodlawn
At Grassmere, Inc., 116 F.3d 28, 31 (2d Cir. 1997)(internal citations omitted).  In order to prevail
on such a defense, the defending party must show "'excusable ignorance of the contents of the
writing signed.'"  Id. at 32.  One way to demonstrate "excusable ignorance" is to show that the
document that the party intended to sign was substituted for another document that introduced
"important terms that were materially different from those to which the party had agreed."  Id.

In Hetchkop, an employer was allowed to assert fraud in the execution as a defense to the
pension fund's claims for payment because there was evidence that the union represented a
document in a certain way to the employer and then secretly swapped the document with another
document when the employer was ready to sign the document.  Hetchkop, 116 F.3d at 33-35.
Thus, the employer was stuck with a completely different document that differed in its material
terms from the agreement the employer had contemplated.  Id.  Accordingly, the Second Circuit

held in <u>Hetchkop</u> that the employer could demonstrate fraud in the execution and vacated the district court's dismissal of the employer's fraud in the execution defense, remanding the case for further proceedings.  <u>Id.</u>; <u>see also</u> <u>Operating Engineers Pension Trust v. Gilliam</u>, 737 F.2d 1501, 1504 (9th Cir. 1984)(affirming district court's dismissal of union fund's claim against contractor because "he who signs a document reasonably believing it is something quite different than it is cannot be bound to the terms of the document.").

Under the circumstances in this case, Defendants' allegations must be construed as "fraud in the execution" because the Broadway CBA and the Worth CBA signed by Defendants materially differed in their essential terms with respect to what the Plan actually provided to Defendants' employees.  When Defendants' employees sought payment for their claims under the health plan, employees could not obtain payments because *there was no real plan in operation.* (Ex. A, Am. CC ¶¶21, 24, 28).  Obviously, because an essential term of both the Broadway CBA and the Worth CBA (*i.e.*, to provide for a medical benefit plan) did not actually exist as promised, Mr. Perry's misrepresentations on behalf of both the Union and the Plan related to the "character or essential terms" of the CBAs and support Defendants' theory of fraud in the execution.[11]  (<u>Id.</u> ¶¶4, 13).  Thus, Defendants have established sufficient facts to survive a motion to dismiss because they have alleged fraud in the execution, which is a valid defense to a

---

[11] This case is similar to the old Monty Python routine in which an individual buys an insurance policy and his claim under the policy is turned down.  When the insured individual asks the insurer what types of claims are covered by the policy, the insurer informs him that his policy does not cover any claims, which is why the premiums are so reasonable.  Here, Defendants were told that the Plan provided comprehensive medical coverage for Defendants' employees who were covered by the Broadway CBA and the Worth CBA.  (Ex. A, Am. CC ¶¶4, 13).  However, when Defendants' employees sought coverage for their claims, the bargained-for benefits were not available to them. (<u>Id.</u> at ¶¶21, 24, 28).  Thus, Mr. Perry misrepresented the existence and nature of the Plan itself.  (<u>Id.</u> at ¶¶4, 13). Accordingly, Defendants were defrauded as to the essential terms of the Broadway CBA and the Worth CBA (*i.e.*, the availability of insurance coverage) and in essence were committing to a completely different agreement that did not give the promised medical coverage to Defendants' employees.  Under this set of facts, Defendants have alleged fraud in the execution because the misrepresentations that were made concerning the health plan were related to an essential term of each CBA, *i.e.*, the availability of employee health benefits.

claim for delinquent contributions.  See Trustees of the ALA-Lithographic Pension Plan v. Crestwood Printing Corp., 141 F. Supp. 2d 406, 411-12 (S.D.N.Y. 2001)(dismissing fund's contribution claims against employer because employer established fraud in the execution based on the fund's substitution of documents).

The cases relied upon by Plaintiff are distinguishable from this case.  For example, in Bricklayers & Allied Craftworkers Local 2 v. C.G. Yantch, Inc., 316 F. Supp. 2d 130, 147-48 (N.D.N.Y. 2003), the employer could not establish fraud in the execution because the misrepresentations of the fund to the employer concerned the number of employees who would receive such coverage.  Yantch, 316 F. Supp. 2d at 148. However, because the employer always knew that it was going to be making contributions to a health plan that would provide some measure of coverage to its employees, the misrepresentations concerning the *scope* of the contributions did not void the employer's obligation to make contributions to the fund in the first place.  Here, Defendants assert that Mr. Perry misrepresented that a valid health plan would be provided to Defendants' employees as part of the Broadway CBA and the Worth CBA when, in fact, the Plan did not exist in a viable way or provide the promised benefits.  (Ex. A ¶¶4, 13, 21, 24, 28).  Accordingly, the misrepresentation as to whether or not a real health plan *existed* was certainly an "essential term" of both the Broadway CBA and the Worth CBA, making Yantch wholly distinguishable.[12]

---

[12] Plaintiff also relies on Agathos v. Starlite Motel, 977 F.2d 1500 (3d Cir. 1992), in which the Third Circuit affirmed the dismissal of an employer's fraud in the execution defense because the employer failed to make any allegations concerning misrepresentations as to the nature of the agreement that the employer signed, and the employer did not allege that it signed a different document from what it thought it was signing.  As already detailed, Defendants have alleged that Mr. Perry misrepresented that a real health plan existed, when, in fact, there was no real health plan to begin with.  (Ex. A ¶¶4, 13, 21, 24, 28).  Mr. Perry also made misrepresentations concerning the Plan's compliance with federal and state regulations, when, in fact, the Plan was not in compliance.  (Id. at ¶¶40, 42).  Thus, Defendants have alleged misrepresentations concerning the essential terms of the agreement, so fraud in the execution has been sufficiently alleged to survive a motion to dismiss.

IV.  **PLAINTIFF CANNOT RELY ON THE RELATION-BACK DOCTRINE BECAUSE THE AMENDED COMPLAINT CONTAINS EVENTS KNOWN AT THE TIME THE ORIGINAL COMPLAINT WAS FILED**

Pursuant to Rule 15(c) of the Federal Rules, Plaintiff argues that its claims in the First Amended Complaint for contributions since July 20, 2001, *i.e.*, the date that Defendants' first payment was due to the Plan, are timely under the relation-back doctrine because the original complaint was filed on July 12, 2007, within the limitations period of six years. Under Rule 15(c) of the Federal Rules, Plaintiff was not entitled to amend the Complaint to add time-barred claims unless those claims "related-back" to the same transaction, occurrence or events alleged in the original complaint. See FED. R. CIV. P. 15(c).

The parties do not dispute that a six-year statute of limitations period exists for Plaintiff to collect delinquent payments for purposes of ERISA. See Calemine v. Gesell, No. 06-Civ-4736(SJ)(RM), 2007 U.S. Dist. LEXIS 78067, at *14 (E.D.N.Y. Sept. 28, 2007)(dismissing time-barred ERISA claims based on six-year limitations period); Textile Workers Pension Fund v. Findlay Indus, Inc., No. 97-Civ-9277(HB), 1998 U.S. Dist. LEXIS 17715, at *5 (S.D.N.Y. Nov. 10, 1998)(same). However, Plaintiff's motion to strike Defendants' statute of limitations defense must be denied because Plaintiff's original complaint, filed on July 12, 2007, only requested relief for contributions *beginning in 2003* and going forward. At the time of Plaintiff's initial filing of the complaint, *i.e.*, 2007, Plaintiff was clearly on notice of the alleged delinquencies dating back to July 20, 2001 that it now asserts in the First Amended Complaint. However, Plaintiff failed to make such claims and, accordingly, waived its right to assert such claims based on a "relation-back" theory in 2008 when they were already time-barred. Valerio v. Phillips, No. 02-Civ-903(RJA)(VEB), 2007 U.S. Dist. LEXIS 86327, at *21-22 (W.D.N.Y. Nov. 21, 2007)(finding relation back inappropriate because new complaint pled claims that were

"wholly different . . . with regard to their timing" which denied respondent fair notice); <u>Grace v.</u>
<u>Rosenstock</u>, No. 85-Civ-2039(DGT), 1996 U.S. Dist. LEXIS 18463, at *22 (E.D.N.Y. Sept. 30,
1996)(denying amendment of complaint because "courts have declined to apply the relation back
doctrine to allow the addition of new claims for relief based on transactions or events not
included in the original pleading").

Because Plaintiff's original complaint failed to account for occurrences prior to June 4,
2002 (*i.e.*, six years prior to the filing of the First Amended Complaint on June 4, 2008) that
were known at the time of the filing of the original complaint in July 2007, Plaintiff cannot now
seek delinquent payments for events between June 2001 and June 4, 2002 in the First Amended
Complaint because they were not referenced in the original complaint and are clearly time-barred
by the six-year statute of limitations period.  To allow Plaintiff to rely on the "relation-back"
doctrine in this context would prejudice Defendants by depriving them of the protection of any
statute of limitations.[13]  Accordingly, Defendants are entitled to discover these issues and to rely
on the statute of limitations defense.

V.    **PLAINTIFF CANNOT SUE FOR CONTRIBUTIONS TO THE PLAN BECAUSE
DEFENDANTS' EMPLOYEES NEVER RECEIVED THE BENEFITS THAT
PLAINTIFF AND THE UNION AGREED TO PROVIDE**

Plaintiff argues that the Court should strike Defendants' affirmative defense concerning
Plaintiff's standing to bring this ERISA action because Plaintiff's standing as a fiduciary of the
Plan was contemplated by ERISA.  However, Plaintiff misses the point.  Defendants' purpose for
asserting their affirmative defense is that Defendants entered into the Broadway CBA and the
Worth CBA with the intention that Defendants' employees would receive health benefits from

---

[13] Indeed, this is not the typical "relation-back" case where Plaintiff forgot to include a defendant or wanted to plead
more specific allegations than those contained in the original complaint.  Rather, Plaintiff added *entirely new claims*
that accrued prior to the limitations period and which it could have added in the original complaint but chose not to.

the Plan. (Ex. A. Am. CC ¶¶4, 7, 13, 14). Instead, Defendants' employees failed to receive the promised benefits. (Id. at ¶¶21, 24, 28). Accordingly, Plaintiff cannot now claim that Defendants owe the Plan delinquent contributions when, in fact, Plaintiff, through the Union as its agent, never upheld its end of the bargain by providing Defendants' employees' with the promised medical benefits. Thus, Defendants are entitled to discovery concerning Plaintiff's ability to bring this case when it was unjustly enriched by Defendants' prior contributions and failed to provide benefits to Defendants' employees.[14]

In support of its motion to strike, Plaintiff relies on N.Y. State Teamsters Conf. Pension & Retirement Fund v. Boening Bros. et al., 92 F.3d 127 (2d Cir. 1996), for the proposition that the very fact that Defendants made contributions to the Plan instills liability in Defendants for delinquent contributions, regardless of whether or not the Broadway CBA and the Worth CBA explicitly incorporated the trust documents or audit policies. While Defendants acknowledge the holding of Boening Bros., Defendants contend that Boening Bros. is significantly distinguishable from the instant case. In Boening Bros. (and the cases cited therein), the employees covered by the collective bargaining agreements *actually received the health benefits promised to them* as part of the health plan referenced in the collective bargaining agreements. Thus, whether or not the trust documents were incorporated into the collective bargaining agreement, the employer received the bargained-for benefit (*i.e.*, employees received their health benefits). Accordingly, the employer was liable for its outstanding contributions.

As stated previously, neither the Broadway CBA nor the Worth CBA incorporated any of the trust documents or audit policies that Plaintiff relies on in this lawsuit to compel the audit for

---

[14] Indeed, Plaintiff's assertion of this action for delinquent contributions brings to mind the Yiddish expression of *chutzpah*, which describes the ludicrous scenario of a boy who is convicted of killing his parents and then begs the court for mercy because he is an orphan.

delinquent payments. (Ex. A, Am. CC ¶¶6, 16; Exs. B, C, D). In addition, the Worth CBA does not even mention the Plan at issue, leaving the choice of medical benefits to the Defendants. (Ex. A, Am. CC ¶5; Ex. B). In light of <u>Boening Bros.</u>, however, the basis of Defendants' affirmative defense is that even if Defendants' prior contributions bound Defendants to the Plan's contribution and/or audit scheme, *health benefits were not provided to Defendants' employees as promised*, so Defendants must not be compelled to make further contributions or submit to an audit. In fact, Defendants had to seek other health care coverage for some employees as a result of the Plan's fraudulent actions. (Ex. A, Am. CC ¶34). Accordingly, given that neither Defendants nor the bargaining unit employees who should have received the bargained-for benefits ever actually received the promised benefits from the Plan, it would be inequitable to prevent Defendants from exploring the basis for Plaintiff's standing to assert delinquent contribution claims and its relationship to the Union with respect to these issues. <u>Geller</u>, 86 F.3d at 23. Thus, the Court should deny Plaintiff's motion to strike Defendants' affirmative defense concerning Plaintiff's standing in this context.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court accept Defendants' Amended Counterclaims, deny Plaintiff's motion to dismiss Defendants' counterclaims and deny Plaintiff's motion to strike Defendants' affirmative defenses.

Dated: New York, New York
      August 22, 2008

                               Respectfully submitted,
                               MCDERMOTT WILL & EMERY LLP

                               By:_____
                                   Joel E. Cohen, Esq.
                               340 Madison Avenue
                               New York, New York 10173
                               (212) 547-5400
                               *Attorneys for Defendants*